UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

RORY D. JOSHUA,

          Plaintiff,

     v.

BAKER, Correctional Officer, et al.,

          Defendant(s).

Case No. 16-cv-07129-CRB (PR)

**ORDER GRANTING DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT
AND DISMISSAL**

(ECF No. 34)

On March 28, 2017, while plaintiff was incarcerated at San Quentin State Prison (SQSP), he filed a pro se First Amended Complaint (FAC) under 42 U.S.C. § 1983 alleging that medical and correctional staff at SQSP were deliberately indifferent to his serious medical needs by denying and delaying necessary medical treatment and accommodations, and retaliated against him for filing prisoner appeals by further denying and delaying necessary medical treatment and accommodations. On March 31, 2017, the court found that plaintiff's allegations, when liberally construed, appeared to state cognizable claims under § 1983 for deliberate indifference to serious medical needs and for retaliation against the named defendants – doctors D. Leighton, C. David and E. Tootell; registered nurse (RN) N. Podolsky; correctional officers V. Baker, S. Sangmaster and J. Carlton; and Warden R. Davis – and ordered the U. S. Marshal to serve them.

Defendants move for summary judgment on the ground that there are no material facts in dispute and that they are entitled to judgment as a matter of law. They also claim that they are entitled to qualified immunity, and to dismissal of plaintiff's claims against Davis and plaintiff's claims for damages against all defendants in their official capacity. After several extensions of time, plaintiff filed an opposition and defendants filed a reply.

Because plaintiff is no longer in custody, all claims for declaratory and/or injunctive relief are dismissed as moot. Only plaintiff's claims for damages against defendants remain.

# BACKGROUND

Unless otherwise noted, the following facts are undisputed:

A.     Armstrong Remedial Plan

Armstrong v. Brown, No. 4:94-cv-02307-CW (N.D. Cal. filed June 29, 1994), is a pending federal class action regarding California Department of Corrections and Rehabilitation's (CDCR) compliance with the Americans with Disabilities Act, 42 U.S.C. § 12101, et seq. (ADA).  Thorpe Decl. (ECF No. 33-14) ¶ 1.  The Armstrong remedial plan was agreed to by the parties and the court.  Id. ¶ 3. The plan sets forth a Disability Placement Program (DPP) to assure nondiscrimination against prisoners with disabilities.  Id. ¶ 4.  Prisoners with permanent mobility impairments severe enough to require special housing and programing are assigned special placement in a designated DPP facility.  Id.  Prisoners with a permanent impairment of lesser severity may be assigned to any of CDCR's facilities consistent with existing case factors.  Id.

Under the Armstrong remedial plan, prisoners with a mobility disability are assigned one of five disability codes – DPW, DPO, DPM, DLT or DNM.  See id. Ex. C at 12.  During the relevant time period, plaintiff was designated as DNM, DPM and DNM again.  DNM inmates may "require an assistive device accommodation to ambulate because of a disability, but the disability is not severe enough to require special housing or level terrain." Id.  DNM inmates can "walk up or down steps/stairs." Id.  DPM inmates have "severe mobility restrictions and use[] an assistive device other than a wheelchair to ambulate, and cannot walk up or down stairs because of the disability." Id.  Medical staff determine the appropriate disability code for a prisoner with a mobility disability and any physical limitations the prisoner may have.  Id. ¶ 5.

SQSP does not house prisoners with any no stairs or ground floor housing restrictions.  Id. ¶ 22.  If a prisoner is identified as having such restrictions, he is referred for transfer to a prison that can accommodate his needs and provide access to all programs, services and/or activities, as required under the Armstrong plan.  Id.  Prisoner designated as DNM can be housed at SQSP.

B.     Medical Treatment and Accommodations at SQSP

Plaintiff arrived at SQSP on December 17, 2015.  FAC (ECF No. 9) at 3.  He informed prison officials at that time that he suffered from "degenerative disc disorder, neuropathy in the

2

left leg, and numbness in the foot [and] arthritis in the spine." Id.  He also informed them that medical staff at his former prison had verified him as disabled and requiring "to be on ground floor, lower bunk [and] no stairs." Id.  But the only housing restriction imposed by SQSP medical staff that day – specifically by Dr. Davy Wu – was "Bottom Bunk." Gonzales Decl. (ECF No. 33-9) Ex. A at MEDS 000123.  Dr. Wu also indicated "Transport Vehicle with Lift" and "Restraint Alert for Non-Emergent Escort or Transportation" on plaintiff's Comprehensive Accommodation Chrono (CAC).  Id.

On December 31, 2015, plaintiff saw defendant Dr. Leighton for the first time.  Plaintiff was upset about being tapered off the pain medication Gabapentin and stated that he had "pain in both arms as well as his left leg." Id. at MEDS 000096.  He reported that he had an MRI of his cervical spine at Highland Hospital and lower back surgery at UC Davis Medical Center. Leighton noted that plaintiff was on "Amitriptyline 50 mg every night at bedtime [and] Naprosyn 500 mg twice a day as needed for pain." Id.  He had a CAC for a cane and bottom bunk, but did not appear to have a Disability Placement Program Verification (DPPV).  Leighton also noted that a recent x-ray of plaintiff's back was "normal except for . . . postoperative changes," and that plaintiff "walks slowly with a cane . . . but does not appear to be in any severe pain." Id.  Leighton increased the Amitriptyline "from 50 to 75 mg" for plaintiff's neuropathic pain, and explained to plaintiff "that it takes time for a change in dosage to become effective [and] that the main concerning side effect is difficulty urinating so we will . . . follow up in 3-4 weeks." Id.  Leighton also ordered plaintiff's medical records from Highland Hospital and UC Davis Medical Center.

On January 28, 2016, plaintiff had a follow-up visit with Dr. Leighton.  Leighton noted that plaintiff's medical records had been received from Highland Hospital but not from UC Davis Medical Center.  Plaintiff "complain[ed] of pain" and that "he is not able to tie his shoes." Id. at MEDS 000087.  Leighton examined plaintiff and found "no objective evidence" of plaintiff's "supposed left lower extremity neuropathy." Id.  She specifically noted that plaintiff "moved very quickly" and that she "doubt[ed] that he is not able to tie his shoes.  He was able to take off his jacket and put it back on.  He was acting as if he could not move his shoulders, but when he was getting dressed, he had no problem." Id.  According to Leighton, plaintiff "moved perfectly

normal, looked perfectly healthy and did not grimace or show any evidence of pain." Id. She

nonetheless increased plaintiff's Amitriptyline to "25 mg in the morning" and 75 mg in the

evening, e-mailed UC Davis Medical Center to try to get plaintiff's medical records, and directed

plaintiff to follow up in a month or so. Id.

On February 2, 2016, Dr. Leighton completed a DPPV for plaintiff in which she

designated him as having "No Disability." Id. at MEDS 000121. But she reaffirmed "Bottom

Bunk," "Transport Vehicle with Lift" and "Restraint Alert for Non-Emergent Escort or

Transportation" on an updated CAC. Id. at MEDS000122.

On March 10, 2016, plaintiff had a follow-up visit with Dr. Leighton. Leighton noted that

plaintiff "complains of pain in his neck and various other parts of his body; however, his

appearance totally belies these complaints. Today he came with a cane with his mobility impaired

vest on, walking casually, getting up and down from the chair with no difficulty and not appearing

to be in any pain whatsoever." Id. at MEDS000083. Leighton also noted that UC Davis Medical

Center had no record of treating plaintiff between 2007 and 2009, as plaintiff reported, but she

nonetheless continued with the "Amitriptyline and Naprosyn as needed" for chronic pain. Id.

On April 7, 2016, plaintiff saw Dr. Leighton again complaining of pain in his neck and

hands. Leighton noted that plaintiff "was able to move his neck in a fairly normal way, even

though he complained of pain. He was able to abduct and forward flex his shoulders with minimal

difficulty. He was able to flex and extend his hands and elbows with no difficulty." Id. at

MEDS000079. Leighton also noted that although UC Davis Medical Center has no record of

treating plaintiff, plaintiff "does have a scar in his low back area." Id. Leighton requested a "nerve

conduction study and EMG," id., a test to record the electrical activity in plaintiff's muscles,

Leighton Decl. (ECF No. 33-10) ¶ 11.

On May 17, 2016, plaintiff submitted a reasonable accommodation request for a CAC for

no stairs, ground floor and lower bunk. See Thorpe Decl. Ex. C at 7. The Reasonable

Accommodation Panel (RAP), which included defendant correctional officer Carlton, referred the

matter to the medical department for clarification of plaintiff's disability status/designation. On

May 31, 2016, Dr. Leighton completed an updated DPPV for plaintiff in which she re-designated

1    him as "Disability Confirmed" and "DNM." Gonzales Decl. Ex. A at 000119. Leighton also

2    reaffirmed "Bottom Bunk" and "Restraint Alert for Non-Emergent Escort or Transportation" on an

3    updated CAC, but consistent with the DNM designation did not indicate that plaintiff required

4    "Ground Floor - No Stairs." Id. at MEDS000120. On June 3, 2016, RAP denied plaintiff's request

5    for a CAC for no stairs and ground floor based on plaintiff's recent DNM designation, and found

6    that plaintiff is housed appropriately "Lower/Bottom bunk." Thorpe Decl. Ex. C at 5.

7        On June 1, 2016, plaintiff began seeing defendant Dr. David for medical treatment.

8    Plaintiff complained of chronic pain and inadequate pain management regimen, and again sought

9    Gabapentin. He claimed a history of low back and left lower extremity pain and nerve damage,

10   and neck and bilateral arm discomfort. David ordered a magnetic resonance imaging (MRI) test to

11   evaluate possible "cervical stenosis or radiculopathy" as recommended by neurology after a May

12   5, 2016 EMG (ordered by Dr. Leighton on April 7, 2016). Gonzales Decl. Ex. A at MEDS

13   000065. David also sought an x-ray for plaintiff's right shoulder, but plaintiff declined. As to

14   plaintiff's complaint of general chronic pain, David elected to keep plaintiff on his current pain

15   management regimen of Amitriptyline and Naproxen (Amitriptyline dosage of 25 mg in the

16   morning and 75 mg at bedtime was changed to 100 mg at bedtime "to simplify dosage," though),

17   and monitor him and "try other adjuvant treatments" before considering Gabapentin. Id.

18       On June 21, 2016, plaintiff submitted a reasonable accommodation request for "a medical

19   pillow for my neck" and "therapeutic [shoes] I don't have to tie." Thorpe Decl. Ex C at 20. On

20   June 23, 2016, defendant Carlton met with plaintiff to discuss plaintiff's request. During the

21   meeting, plaintiff also requested use of the elevator in the medical building to access the law

22   library. Carlton Decl. (ECF No. 33-3) ¶ 13. Carlton informed plaintiff that "such a permanent

23   [elevator] accommodation could not be granted because it would require the inmate to be escorted

24   by staff each and every time the inmate sought access to the law library," and SQSP "did not have

25   the staffing necessary to provide such a permanent accommodation." Id. Carlton further explained

26   that SQSP "cannot house inmates with a limited or no-stair restriction," and that "if medical staff

27   determined that such a restriction was necessary," plaintiff could be transferred to another facility.

28   Id. ¶ 16. On June 29, 2016, RAP, which again included Carlton, denied plaintiff's request for a

medical pillow and therapeutic shoes because "[i]t was determined by medical that you do not

meet the medical criteria to receive medical pillow and therapeutic shoes." Thorpe Decl. Ex. C at

19.[1] Plaintiff was provided slip on shoes, though. See id. at 19, 29.

On June 28, 2016, plaintiff had a follow-up visit with Dr. David. David noted that

plaintiff had received an MRI on June 14, 2016 that showed "multilevel cervical arthrosis," but no

"subluxation or cord lesion." Gonzales Decl. Ex. A at MEDS 000049. "He did have some mild

neural foraminal stenosis," but nothing which would explain his EMG findings. Id. David

referred plaintiff for an orthopedic surgery consultation and continued his pain management

regimen of Amitriptyline and Naproxen. David also ordered plaintiff some "gel insoles to see if

that can help with his foot discomfort" and some "bilateral wrist braces." Id.

On August 1, 2016, plaintiff had a follow-up visit with Dr. David. Plaintiff reported pain

in his arm and his left big toe and foot. He reiterated that his current pain management regimen is

not working as well as his prior Gabapentin. David elected to continue plaintiff's pain

management regimen of Amitriptyline and Naproxen "for now," and prescribed him "some

capsaicin cream with instructions to use on his foot onto an area that is the most painful." Id. at

MEDS 000040. David also referred plaintiff for shoulder x-rays as requested by orthopedic

surgery, and continued to wait for an orthopedic surgery consultation.

On September 1, 2016, Dr. David completed an updated DPPV for plaintiff in which she

designated him as "Disability Confirmed" and "DPM." Gonzales Decl. Ex. A at 000115. Because

SQSP does not house prisoners designated as DPM, who cannot walk up or down stairs because of

their mobility disability, plaintiff was referred for transfer to a designated DPP facility. Thorpe

Decl. ¶ 23.

On September 6, 2016, plaintiff had a follow-up visit with Dr. David. Plaintiff again

sought Gabapentin and complained that "he is unable to go up and down stairs because of pain in

his left foot and leg." Gonzales Decl. Ex. A at MEDS 000031. Plaintiff reported that if "he tries to

---

[1]According to Dr. David, plaintiff was evaluated for a cervical pillow by RN G. Han on June 23, 2016 and denied because cervical pillows that provide greater support to the neck are prescribed only in extenuating circumstances, including post-operative care if a specialist recommends it. David Decl. (ECF No. 33-6) ¶ 8.

walk upstairs he will feel pain in his left foot, and sometimes will get cramping in his feet." Id. But David's exam of plaintiff found nothing to support his claims and she questioned her recent DPM designation for plaintiff. David specifically noted that plaintiff "has good strength" and, "based on his physical examination and history, should be able to do stairs." Id. "I do not think this would qualify him for [DPM] status." Id. David also noted that plaintiff's MRI "was not really significant" and that recent shoulder x-rays were "unremarkable." Id. at MEDS 000032. But due to apparent side effects of Amitriptyline (plaintiff reported difficulty urinating), David started tapering plaintiff off Amitriptyline and started him on the neuropathic pain medication Oxcarbazepine.

On September 20, 2016, plaintiff had a follow-up with Dr. David. David noted that orthopedic surgery had reviewed plaintiff's MRI and "felt that he had some significant disease, especially in the C3-C4 region and recommended neurosurgery consultation." Id. at MEDS 000026. Plaintiff complained of continued chronic pain and urinary symptoms, so David continued to taper him off Amitriptyline and prescribed him Flomax for urinary symptoms and a trial of Duloxetine for chronic pain. She also referred him to neurosurgery for a consultation.

On September 23, 2016, Dr. David completed a DPPV for plaintiff in which she formally changed his mobility disability designation from "DPM" back to "DNM" after questioning her September 1, 2016 DPM designation for plaintiff during her September 6, 2016 exam of him. Id. at MEDS 000112. But David reaffirmed "Bottom Bunk" (with an expiration date of March 22, 2017) and "Restraint Alert for Non-Emergent Escort or Transportation," and added "Lifting Restriction – Unable to lift more than 19 pounds," on an updated CAC. Id. at MEDS000113. Because prisoners designated as DNM can be housed at SQSP, plaintiff's referral for transfer to a designated DPP facility was rescinded. Thorpe Decl. ¶ 23.

On November 4, 2016, plaintiff had a follow-up visit with Dr. David. David noted that plaintiff had a neurosurgery consultation but that she did not yet have a "full note" from the consultation. Gonzales Decl. Ex. A at MEDS 000013. But the preliminary report from neurosurgery (1) requested a further MRI of plaintiff's "lumbosacral spine" to evaluate plaintiff's lower back pain with leg numbness and tingling, and (2) recommended physical therapy and

"possible epidural steroid injections" for plaintiff's pain in his "upper neck, upper arm, and upper back." Id. David referred plaintiff for a further MRI but elected to hold off on physical therapy and injections until she received neurosurgery's "full dictated note." Id. at MEDS 00014. She continued plaintiff on his "current [pain] medications" (noting that he "is very functional right now") and wrote that she will refer him to "Pain Management for injections if that is indeed what Neurosurgery has recommended. I think that the patient would benefit from it." Id.

On December 20, 2016, plaintiff had a follow-up visit with Dr. David. David noted that plaintiff had just had "right carpal tunnel surgery" and was "doing well." Id. at MEDS 000003. Plaintiff also had started physical therapy for his upper neck/arm/back chronic pain and had been referred to pain management for "epidural steroid injections." Id. David was still waiting for neurosurgery's evaluation as to whether plaintiff "may be a candidate for repeat surgery" to address his chronic lower back pain. Id. If not, David noted that she would refer plaintiff to pain management "for low back evaluation and possible injections." Id. David continued plaintiff on his "current [pain] medications" at least until his pain management consult and injections. Id. at MEDS 000004.

C.      Plaintiff's Prisoner Appeals

On February 8, 2016, plaintiff submitted health care appeal number SQ HC 16040754. He sought an "MRI examination to determine the depth and severity of the pain in my neck, arms and hands," and the reinstatement of certain pain medications. Lewis Decl. (ECF No. 33-11) Ex. B at 3-6. On March 3, 2016, defendant RN Podolsky interviewed plaintiff regarding the appeal. Id. at 7. On March 4, 2016, Dr. M. Rowe partially granted the appeal at the first level of review because plaintiff had received a medical evaluation and been prescribed pain medication. But plaintiff's request for an MRI and the pain medications Gabapentin and Baclofen were deemed medically unnecessary and denied. See id. at 7-8. Plaintiff appealed to the second level of review. On April 22, 2016, defendant Dr. Tootell issued a second level decision agreeing with Rowe. Tootell added that on April 7, 2016, Dr. Leighton had ordered EMG nerve conduction studies to evaluate plaintiff's pain. See id. at 9-10. Plaintiff appealed to the third level of review. On August 15, 2016, Deputy Director J. Lewis determined that no modification order was necessary and denied

the appeal at the third and final level of review.  See id. at 1-2.

On June 6, 2016, plaintiff submitted health care appeal number SQ HC 16041044. Plaintiff sought adequate medical treatment and pain medication, and a no stairs CAC.  Lewis Decl. Ex. C at 3-5.  On June 23, 2016, RN Podolsky interviewed plaintiff regarding the appeal.  Id. at 7.  On July 21, 2016, Dr. Rowe partially granted the appeal because plaintiff had received a medical evaluation and had been prescribed pain medication.  But plaintiff's request for a no stairs CAC was denied as medically unnecessary because plaintiff's primary care provider (PCP), Dr. Leighton, had designated plaintiff as DNM on May 31, 2016 and "indicated that you are able to walk up and down stairs." Id. at 9.  Plaintiff appealed to the second level review.  On September 16, 2016, Dr. Tootell issued a second level decision agreeing with Rowe.  Tootell added that Dr. David very recently (on September 1, 2016) had changed plaintiff's disability designation to DPM and encouraged plaintiff to continue working with David "in order to obtain the best possible outcome." Id. at 14.  Plaintiff appealed to the third level of review.  On January 20, 2017, Deputy Director Lewis determined that no modification order was necessary and denied the appeal at the third and final level of review.  See id. at 1-2.

On July 6, 2016, plaintiff submitted health care appeal number SQ HC 16041113.  Plaintiff sought "accommodation that has no stairs, use of a ramp or elevator" and "shoes I don't have to tie." Lewis Decl. Ex. D at 3.  On July 14, 2016, RN Podolsky interviewed plaintiff regarding this appeal.  Id. at 7.  On August 8, 2016, Dr. D. Smith partially granted the appeal because plaintiff had been given slip-on shoes, gel insoles and "Propet shoes which have a Velcro closure and thicker soles." Id. at 7.  But plaintiff's no stairs, use of a ramp or elevator accommodation was denied as medically unnecessary because plaintiff's PCP had designated him as DNM on May 31, 2016 and "indicated that you are able to walk up and down stairs." Id. at 8.  Plaintiff appealed to the second level of review.  On October 11, 2016, Dr. Tootell issued a second level decision agreeing with Smith.  Tootell added that after examining plaintiff on September 6, 2016, Dr. David changed plaintiff's disability designation back to DNM and indicated that plaintiff "should be able to do stairs." Id. at 12.  Plaintiff appealed to the third level of review.  On January 20, 2017, Deputy Director Lewis determined that no modification order was necessary and denied the

appeal at the third and final level of review.  See id. at 1-2.

On July 30, 2016, plaintiff submitted custody appeal number SQ G 16-01605.  Plaintiff alleged that on three different occasions in June 2016 he spoke with defendants correctional officers Baker, Sangmaster and Carlton about his mobility disability and requested elevator access to the law library, but defendants refused to grant him elevator access and told him that he may require a transfer to another prison.  Dahl Decl. (ECF No. 33-5) Ex. B 1-2.  Plaintiff sought elevator access without threat of a transfer, and a medical pillow and medical shoes.  Id.  The appeal was rejected because it was not submitted on departmentally approved forms.  See id. at 4-5.  Plaintiff was advised to submit the appeal on the correct form.  See id.

On August 6, 2016, plaintiff submitted health care appeal number SQ HC 16041198.  Plaintiff sought "appropriate accommodation chrono and medication to help my neuropathy, the severe arthritis in my spine and shoulders and arms."  Lewis Decl. Ex. E at 3.  On August 31, 2016, Supervising Registered Nurse (SRN) C. Oliver interviewed plaintiff regarding this appeal.  Id. at 9.  On September 22, 2016, SRN R. Gordon partially granted the appeal because plaintiff "was seen by Dr. David and she addressed your chronic pain and medications issues."  Id. at 10.  And at a recent September 6, 2016 visit with Dr. David, she "re-evaluated your chrono and made changes to your medications."  Id.  Plaintiff appealed to the second level of review.  On December 7, 2016, Chief Nurse Executive (CNE) C. Dola issued a second level decision agreeing with Gordon.  Id. at 7-8.  Dola added that on September 23, 2016, Dr. David had granted plaintiff temporary "low bunk housing" and confirmed his DNM designation.  Id. at 8.  Plaintiff appealed to the third level review.  On February 23, 2107, Deputy Director Lewis determined that no modification order was necessary and denied the appeal at the third and final level of review.  See id. at 1-2.

On August 31, 2016, plaintiff submitted two appeals – custody appeal number SQ I 16-02206 and health care appeal SQ HC 16041252.  In custody appeal SQ I 16-02206, plaintiff again alleged that he was threatened with a transfer to another prison after seeking elevator access to the law library, and again sought "shoes I don't have to tie." Dahl Decl. Ex. C at 1-2.  The appeal was cancelled as duplicative of "a previous appeal upon which a decision has been rendered or is

United States District Court
Northern District of California

pending." Id. at 3. In health care appeal SQ HC 16041252, plaintiff alleged "malicious mischief"

against medical staff, and sought proper medical treatment and ground floor housing. Lewis Decl.

Ex. F at 3-5. On September 29, 2016, RN Podolsky interviewed plaintiff regarding this appeal.

Id. at 11. On October 13, 2016, Dr. D. Smith partially granted the appeal because plaintiff had

been evaluated by Dr. David on September 6, 2016 and been prescribed pain medication. But

plaintiff's requests for the pain medications Gabapentin and Baclofen, and ground floor housing,

were deemed medically unnecessary and denied. See id. at 11-13. Plaintiff appealed to the

second level of review. On November 28, 2016, Dr. Tootell issued a second level decision

agreeing with Smith. Tootell added that Dr. David had seen plaintiff on November 4, 2016 and

was referring him to pain management and for further MRI tests. See id. at 7-8. Plaintiff appealed

to the third level of review. On March 10, 2017, Deputy Director Lewis determined that no

modification order was necessary and denied the appeal at the third and final level of review. See

id. at 1-2.

## DISCUSSION

A.    Standard of Review

Summary judgment is proper where the pleadings, discovery and affidavits show that there

is "no genuine dispute as to any material fact and the [moving party] is entitled to judgment as a

matter of law." Fed. R. Civ. P. 56(a). Material facts are those which may affect the outcome of

the case. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A dispute as to a material

fact is genuine if there is sufficient evidence for a reasonable jury to return a verdict for the

nonmoving party. Id.

The moving party for summary judgment bears the initial burden of identifying those

portions of the pleadings, discovery and affidavits which demonstrate the absence of a genuine

issue of material fact. Celotex Corp. v. Cattrett, 477 U.S. 317, 323 (1986). Where the moving

party will have the burden of proof on an issue at trial, it must affirmatively demonstrate that no

reasonable trier of fact could find other than for the moving party. But on an issue for which the

opposing party will have the burden of proof at trial, [as is the case here,] the moving party need

only point out "that there is an absence of evidence to support the nonmoving party's case." Id.

1    Once the moving party meets its initial burden, the nonmoving party must go beyond the

2    pleadings to demonstrate the existence of a genuine dispute of material fact by "citing to specific

3    parts of materials in the record" or "showing that the materials cited do not establish the absence

4    or presence of a genuine dispute." Fed. R. Civ. P. 56(c). A triable dispute of material fact exists

5    only if there is sufficient evidence favoring the nonmoving party to allow a jury to return a verdict

6    for that party. Anderson, 477 U.S. at 249. If the nonmoving party fails to make this showing, "the

7    moving party is entitled to judgment as a matter of law." Celotex, 477 U.S. at 323.

8        There is no genuine issue for trial unless there is sufficient evidence favoring the

9    nonmoving party for a jury to return a verdict for that party. Anderson, 477 U.S. at 249. If the

10   evidence is merely colorable, or is not significantly probative, summary judgment may be granted.

11   Id. at 249-50.

12   B.    Analysis

13       Defendants argue that they are entitled to summary judgment and qualified immunity from

14   plaintiff's deliberate indifference to serious medical needs and retaliation claims. Under Saucier

15   v. Katz, 533 U.S. 194 (2001), the court must undertake a two-step analysis when a defendant

16   asserts qualified immunity in a motion for summary judgment. The court first faces "this

17   threshold question: Taken in the light most favorable to the party asserting the injury, do the facts

18   alleged show the officer's conduct violated a constitutional right?" 533 U.S. at 201. If the court

19   determines that the conduct did not violate a constitutional right, the inquiry is over and the officer

20   is entitled to qualified immunity.

21       If the court determines that the conduct did violate a constitutional right, it then moves to

22   the second step and asks "whether the right was clearly established" such that "it would be clear to

23   a reasonable officer that his conduct was unlawful in the situation he confronted." Id. at 201-02.

24   Even if the violated right was clearly established, qualified immunity shields an officer from suit

25   when he makes a decision that, even if constitutionally deficient, reasonably misapprehends the

26   law governing the circumstances he confronted. Brosseau v. Haugen, 543 U.S. 194, 198 (2004);

27   Saucier, 533 U.S. at 205-06. If "the officer's mistake as to what the law requires is reasonable . . .

28

United States District Court
Northern District of California

the officer is entitled to the immunity defense." Id. at 205.[2]

      1.    Deliberate Indifference to Serious Medical Needs

A prison official violates the Eighth Amendment's proscription against cruel and unusual punishment when he acts with deliberate indifference to the serious medical needs of a prisoner. Farmer v. Brennan, 511 U.S. 825, 828 (1994). To establish an Eighth Amendment violation, a prisoner-plaintiff must satisfy both an objective standard—that the deprivation was serious enough to constitute cruel and unusual punishment—and a subjective standard—deliberate indifference. Snow v. McDaniel, 681 F.3d 978, 985 (9th Cir. 2012). To meet the objective standard, the delay or failure to treat a prisoner's medical condition must result in the "'unnecessary and wanton infliction of pain.'" Id. (quoting Estelle v. Gamble, 429 U.S. 97, 104 (1976)). To meet the subjective standard of deliberate indifference, a prison official must know that a prisoner faces a substantial risk of serious harm and disregard that risk by failing to take reasonable steps to abate it. Farmer, 511 U.S. at 837. The prison official must be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference. Id. Mere negligence, or even gross negligence, is not enough. Id. at 835–36 & n.4.

A difference of opinion between a prisoner-patient and prison medical authorities regarding treatment does not give rise to an Eighth Amendment claim under § 1983. Franklin v. Oregon, 662 F.2d 1337, 1344 (9th Cir. 1981). Similarly, a showing of nothing more than a difference of medical opinion as to the need to pursue one course of treatment over another generally is not enough to establish deliberate indifference. Toguchi v. Chung, 391 F.3d 1051, 1058, 1059–60 (9th Cir. 2004). In order to prevail on an Eighth Amendment claim involving choices between alternative courses of treatment, a prisoner-plaintiff must show that the course of treatment the doctors chose was medically unacceptable under the circumstances and that they chose this course in conscious disregard of an excessive risk to plaintiff's health. Id. at 1058; Jackson v. McIntosh, 90 F.3d 330, 332 (9th Cir. 1996).

---

[2]Although the Saucier sequence is often appropriate and beneficial, it is not mandatory. A court may exercise its discretion in deciding which prong to address first, in light of the particular circumstances of each case. See Pearson v. Callahan, 555 U.S. 223, 236 (2009).

In order to prevail on a § 1983 claim for damages against an individual defendant, a prisoner-plaintiff must show that the defendant's deliberate indifference was the "actual and proximate cause" of the deprivation of plaintiff's Eighth Amendment right to be free from cruel and unusual punishment. Leer v. Murphy, 844 F.2d 628, 634 (9th Cir. 1988). The "inquiry into causation must be individualized and focus on the duties and responsibilities of each individual defendant whose acts or omissions are alleged to have caused the constitutional deprivation." Id. at 633.

a. Doctors Leighton, David and Tootell

Plaintiff claims that doctors Leighton, David and Tootell were deliberately indifferent to his serious medical needs because they denied and delayed necessary medical treatment and accommodations. But the undisputed facts show that while plaintiff was at SQSP, Leighton and David examined and evaluated plaintiff numerous times, and provided him with treatment and accommodations they deemed medically necessary. Leighton examined and evaluated plaintiff at least five times during plaintiff's first five months at SQSP, adjusted his pain regimen medications and referred him for a nerve conduction study/EMG to further assess his complaints of pain. Leighton denied plaintiff's request for the pain medication Gabapentin and for a CAC for ground floor and no stairs as medically unnecessary. Although Leighton reaffirmed plaintiff's bottom bunk accommodation, she determined that plaintiff's movement and strength did not medically support a CAC for ground floor and no stairs. David examined and evaluated plaintiff at least seven times after she took over from Leighton as plaintiff's PCP in June 2016. David adjusted plaintiff's pain regimen medications, tried two new ones rather than plaintiff's preferred Gabapentin, and referred him for MRIs, x-rays, orthopedic surgery and neurosurgery consultations, and eventually physical therapy and epidural steroid injections. David even changed plaintiff's disability designation from DNM to DPM on September 1, 2016. But five days later, during her next examination of plaintiff, David determined that plaintiff "has good strength" and, "based on his physical examination and history, should be able to do stairs." Gonzales Decl. Ex. A at MEDS 000031. "I do not think this would qualify him for [DPM] status." Id. David changed plaintiff's disability designation back to DNM on September 23, 2016.

14

Plaintiff claims doctors Leighton and David were deliberately indifferent to his serious medical needs because they did not prescribe him Gabapentin and provide him with a CAC for ground floor and no stairs. But plaintiff's disagreement with his treating physicians' chosen course of treatment and disability designation is not enough for an Eighth Amendment violation. See Franklin, 662 F.2d at 1344. In order to prevail on an Eighth Amendment claim, plaintiff must show that the course of treatment and disability designation the doctors chose was medically unacceptable under the circumstances and that they chose this course in conscious disregard of an excessive risk to plaintiff's health. See Toguchi, 391 F.3d at 1058. Plaintiff does not.

Plaintiff argues that doctors at his former prison prescribed him Gabapentin and provided him with a CAC for ground floor and no stairs. He even submits a DPPV dated October 27, 2004 in which a California Correctional Center (CCC) doctor designated him DPM with ground floor and no stairs. See FAC Ex. A at 2. But a mere difference of medical opinion as to the need to pursue one course of treatment (or disability designation) over another is not enough to establish deliberate indifference. See id. at 1058, 1059-60. Here, the undisputed facts make clear that doctors Leighton and David chose their course of treatment and disability designation for plaintiff after extensively examining him and his medical records and history. Because plaintiff has not set forth any evidence that Leighton's and David's chosen course of treatment and disability designation for plaintiff were medically unacceptable and chosen in conscious disregard to plaintiff's health, Leighton and David are entitled to summary judgment on plaintiff's Eighth Amendment deliberate indifference claim. See Celotex Corp., 477 U.S. at 323.

Dr. Tootle also is entitled to summary judgment on plaintiff's Eighth Amendment deliberate indifference claim. The undisputed facts show that Tootell conducted the second level review of four medical appeals plaintiff submitted in 2016 in connection with doctors Leighton's and David's chosen course of treatment and disability designation. On each appeal, Tootell reviewed the first level decision and plaintiff's medical records, and found that the first level decision was medically appropriate. Tootell also documented further evidence supporting the first level decisions by noting further treatment plaintiff received or was receiving during the pendency of each appeal. Plaintiff nonetheless claims that Tootell was deliberately indifferent to his serious

United States District Court
Northern District of California

1   medical needs because Tootell did not remedy his treating physicians' failure to prescribe him

2   Gabapentin and provide him with a CAC for ground floor and no stairs.  But as noted above,

3   plaintiff sets forth no evidence that doctors Leighton's and David's chosen course of treatment and

4   disability designation were medically unacceptable and chosen in conscious disregard to plaintiff's

5   health.  Plaintiff's mere disagreement with Tootell's decisions supporting his treating physicians'

6   chosen course of treatment and disability designation is not actionable as an Eighth Amendment

7   violation under § 1983.  See Franklin, 662 F.2d at 1344.[3]

8           b.      RN Podolsky

9           Plaintiff claims that RN Podolsky was deliberately indifferent to his serious

10  medical needs because she failed to intervene on his behalf during the processing of his four

11  medical appeals regarding doctors Leighton's and David's chosen course of treatment and

12  disability designation.  The undisputed facts show that Podolsky assisted SQSP doctors with their

13  first level decisions on plaintiff's four medical appeals by interviewing plaintiff, reviewing his

14  medical and treatment records, and providing that information to the doctors.  Podolsky did not

15  decide plaintiff's medical appeals, but according to plaintiff she should have advised the doctors

16  deciding plaintiff's medical appeals that plaintiff required Gabapentin and a CAC for ground floor

17  and no stairs.  But without any evidence that plaintiff's treating physicians' chosen course of

18  treatment and disability designation were medically unacceptable and chosen in conscious

19  disregard to plaintiff's health, and that Podolsky knew it, plaintiff's claim that Podolsky should

20  have intervened on his behalf amounts to no more than a claim for medical negligence not

21  actionable under § 1983.  See Farmer, 511 U.S. at 835-36 & n.4.

22          c.      Correctional Officers Baker, Sangmaster and Carlton

23          Plaintiff claims that correctional officers Baker, Sangmaster and Carlton were

24  deliberately indifferent to his serious medical needs when in June 2016 they each denied his

25

26          [3]Doctors Leighton, David and Tootell also are entitled to qualified immunity because a
    reasonable prison doctor could have believed that their conduct was lawful under the
27  circumstances.  See Saucier v. Katz, 533 U.S. 194, 201-02 (2001).  A reasonable prison doctor
    could have believed that Leighton's and David's chosen course of treatment and disability
28  designation for plaintiff was medically acceptable and not an excessive risk to plaintiff's health.

16

separate requests for elevator access to go to the law library. But plaintiff's claim is without merit because the undisputed facts show that plaintiff was designated as DNM at that time and had no restrictions in place on using the stairs. Plaintiff's suggestion that Baker, Sangmaster and Carlton should have known better than plaintiff's treating physicians is unavailing. Under the circumstances, no reasonable jury could find that, despite plaintiff's DNM designation, Baker, Sangmaster or Carlton knew that plaintiff faced a substantial risk of serious harm by using the stairs and disregarded that risk by failing to take reasonable steps to abate it. See Farmer, 511 U.S. at 837. At minimum, Baker, Sangmaster and Carlton are entitled to qualified immunity because a reasonable correctional officer could have believed that denying plaintiff elevator access when plaintiff's treating physicians had placed no restrictions on his using the stairs was lawful. See Saucier v. Katz, 533 U.S. 194, 201-02 (2001).[4]

Plaintiff also claims that Carlton was deliberately indifferent to his serious medical needs when, as a member of RAP, Carlton denied plaintiff's request for a CAC for no stairs, ground floor and lower bunk. The undisputed facts show that on June 3, 2016, RAP denied plaintiff's request for no stairs and ground floor based on plaintiff's DNM designation by his treating physicians, and found that plaintiff already was housed lower bunk. Again, plaintiff's suggestion that Carlton (and the other members of RAP) should have known better than plaintiff's treating physicians is unavailing. Cf. Farmer, 511 U.S. at 837. After all, plaintiff sets forth no evidence that plaintiff's treating physicians' chosen disability designation was medically unacceptable or chosen in conscious disregard to plaintiff's health.[5]

_____

[4]Plaintiff's assertion that defendants threatened to transfer him to another prison if he was unable to use the stairs does not compel a different conclusion. Under the Armstrong remedial plan, if a prisoner is identified as having ground floor and/or no stairs housing restrictions, he must be referred for transfer to a prison that can accommodate his needs and provide him access to all programs, services and/or activities, and SQSP is not such a prison. Informing plaintiff of this consequence/requirement did not violate his Eight Amendment rights, even if it sounded like a threat to him.

[5]The same analysis applies to plaintiff's claim that Carlton was deliberately indifferent to his serious medical needs when, again as a member of RAP, Carlton denied plaintiff's request for a medical pillow and therapeutic shoes. The undisputed facts show that on June 29, 2016, RAP denied plaintiff's request because medical staff had determined that plaintiff did not meet the medical criteria to receive a medical pillow and therapeutic shoes. Plaintiff's suggestion that Carlton should have known better than medical staff at most states a claim for negligence not

        d.      Warden Davis

        Plaintiff does not allege that Warden Davis was involved in any way in his medical

care or disability designation/accommodation decisions, or in any appeal determination regarding

his medical care or disability designation/accommodation decisions, or that Davis was even aware

of any of them, although it is well established that a "supervisor is only liable for constitutional

violations of his subordinates if the supervisor participated in or directed the violations, or knew of

the violations and failed to act to prevent them." Taylor v. List, 880 F.2d 1040, 1045 (9th Cir.

1989) (citation omitted).  Plaintiff's sole allegation against Davis is that Davis was "legally

responsible for the training of officers, safety of inmates, overall operations, and policies and

practice (sic) of [SQSP], and for the welfare of all the inmates in that prison." FAC at 1.  But

because plaintiff has set forth no evidence that Davis created or enforced training, policies or

practices that caused plaintiff the constitutional injuries of which he complains, plaintiff cannot

sustain a § 1983 claim of supervisory liability against Davis.  See id.

        In sum, defendants are entitled to summary judgment on plaintiff's Eighth Amendment

deliberate indifference to serious medical needs claims against them.

        2.      Retaliation

        To prevail on a First Amendment retaliation claim, a prisoner-plaintiff must show: (1) that

a state actor took some adverse action against a prisoner (2) because of (3) that prisoner's

protected conduct, that such action (4) chilled the prisoner's exercise of his First Amendment

rights, and that (5) the action did not reasonably advance a legitimate correctional goal.  Rhodes v.

Robinson, 408 F.3d 559, 567–68 (9th Cir. 2005).

        Retaliation claims brought by prisoners must be evaluated in light of concerns over

"excessive judicial involvement in day-to-day prison management, which 'often squander[s]

judicial resources with little offsetting benefit to anyone.'" Pratt v. Rowland, 65 F.3d 802, 807

(9th Cir. 1995) (quoting Sandin v. Conner, 515 U.S. 472, 482 (1995)).  In particular, courts should

"'afford appropriate deference and flexibility' to prison officials in the evaluation of proffered

actionable under § 1983.  See Farmer, 511 U.S. at 835-36 & n.4.

legitimate penological reasons for conduct alleged to be retaliatory." Id.

Plaintiff claims that defendants – doctors Leighton, David and Tootell; RN Podolsky; correctional officers Baker, Sangmaster and Carlton; and Warden Davis – retaliated against him for filing prisoner appeals regarding denial of necessary medical treatment and accommodations by further denying necessary medical treatment and accommodations. But plaintiff does not set forth any evidence showing the requisite elements of a First Amendment retaliation claim against any defendant.

The undisputed facts show that after plaintiff filed his first prisoner appeal on February 8, 2016, and after every appeal thereafter, doctors Leighton and David continued to examine and evaluate plaintiff, and continued to provide plaintiff with treatment and accommodations they deemed medically necessary. But again and again plaintiff sought the pain medication Gabapentin and a CAC for ground floor and no stairs, and again and again Leighton and David determined that Gabapentin and a CAC for ground floor and no stairs were not medically necessary or appropriate, and again and again the reviewing doctors on appeal, including Tootell, found the treating physicians' determinations medically appropriate. Plaintiff's contention that the repeated denials of his repeated requests for his desired pain medication and CAC were in retaliation for his filing prisoner appeals is not supported by the evidence in the record. After all, plaintiff has not set forth any evidence showing that his treating physicians' chosen course of treatment and disability designation/accommodations decisions were medically unacceptable, cf. Rhodes, 408 F.3d at 568 (prisoner-plaintiff must show that asserted retaliatory action did not reasonably advance legitimate correctional goal), or that his filing prisoner appeals "was the 'substantial' or 'motivating' factor behind [Leighton's, David's or Tootell's] conduct," Brodheim v. Cry, 584 F.3d 1262, 1269 (9th Cir. 2009).

Based on the evidence in the record, no reasonable juror could find that doctors Leighton's, David's or Tootell's decisions regarding plaintiff's treatment and accommodations were made in retaliation for plaintiff filing prisoner appeals. Put simply, plaintiff's retaliation claim against Leighton, David and Tootell is based on little more than plaintiff's speculation that their treatment and accommodations decisions were retaliatory, and that is not enough to defeat summary

judgment. See Wood v. Yordy, 753 F.3d 899, 905 (9th Cir. 2014) (speculation that defendants acted out of retaliation no sufficient to defeat summary judgment). Leighton, David and Tootell are entitled to summary judgment on plaintiff's retaliation claim as a matter of law. See Celotex Corp., 477 U.S. at 323.

RN Podolsky, correctional officers Baker, Sangmaster and Carlton, and Warden Davis, also are entitled to summary judgment on plaintiff's retaliation claim as a matter of law. There is no indication that Davis took any adverse action against plaintiff, much less because of plaintiff filing prisoner appeals. And despite plaintiff's assertions that Podolsky, Baker, Sangmaster and Carlton denied him requested treatment/accommodations, and threatened to transfer him to another prison if he continued seeking certain accommodations, out of retaliation for his filing prisoner appeals, there is no probative evidence in the record that plaintiff's "protected conduct was the 'substantial' or 'motivating' factor behind [these defendants'] conduct," Brodheim, 584 F.3d at 1269. As noted earlier, Podolsky, Baker, Sangmaster and Carlton reasonably relied on plaintiff's treating physicians' treatment and disability designation/accommodation decisions in responding to plaintiff's requests, and correctly informed plaintiff that if he was identified as having ground floor and/or no stairs housing restrictions, he would have to be referred for transfer to another prison that can accommodate his needs and provide him access to all programs, services and/or activities. Plaintiff's mere speculation that Poldosky, Baker, Sangmaster and Carlton acted out of retaliation is not enough to defeat summary judgment. See Wood, 753 F.3d at 905.

In sum, defendants are entitled to summary judgment on plaintiff's First Amendment retaliation claims against them.

/

/

/

/

/

/

/

**CONCLUSION**

For the foregoing reasons, defendants' motion for summary judgment and dismissal (ECF No. 34) is GRANTED.[6]

**IT IS SO ORDERED**.

Dated: June 15, 2018

_____
CHARLES R. BREYER
United States District Judge

---

[6]Defendants are entitled to dismissal of plaintiff's claims for damages against them in their official capacities because it is well established that neither a state nor its officials acting in their official capacities may be sued for damages under § 1983.  See Will v. Michigan Dep't of State Police, 491 U.S. 58, 71 (1989).